All right the next case we're going to hear is United States v. Moore and we'll hear from Ms. Bichara first. Good morning and may it please the court, Jacqueline Bichara for the United States. The court should reverse the order dismissing the indictment because the district court's reasoning makes every traffic stop of a black driver in Richmond unconstitutional. That finding of selective enforcement is simply not supported. I'm sorry Judge Niemeyer, that finding of selective enforcement is simply not supported on the striking facts of this case where the officers stopped Mr. Moore's car or attempted to stop his car because they had seen the same fake temporary license plate 11134Y on two other cars earlier that night. I'll start by addressing the discriminatory purpose prong because the defendant's failure to satisfy his burden on that element of his selective enforcement claim is fatal and warrants reversal in this case. The only evidence that is specific to the four officers who conducted this traffic stop, Sergeant Spinos and Officers Colombo, Mills and Williams, is that they had no discriminatory intent whatsoever. In fact, the district court made an express finding at JA1812 that Moore presented no evidence of these four officers' invidious or bad faith. Simultaneously, the court made a finding that this stop was legally justified by their suspicion that he had committed a traffic offense. And so together, those rebut the inference that the district court was required to find that some kind of discriminatory animus was a motivating factor for this traffic stop. So the district court had to go beyond evidence specific to these four officers in order to reach its finding of discriminatory purpose. And that evidence largely falls into two buckets, statistical evidence and historical evidence, all of which broadly can be characterized as lacking any connection to these four officers who conducted the stop. So counsel, what kind of evidence would you be looking for? Because I know you start by saying if the district court is right, then every stop of a black driver is unconstitutional. But if we reverse the district court, do we get the opposite? No stop of a black driver is unconstitutional? Because what kind of smoking gun evidence do you think would be available? Your Honor, it has to have some connection to the officers who actually decided to stop the car. So that's sort of our top line position. Say the officers don't testify, yes, we stopped the car because the driver was black, then what? Right. So this court's decision in Johnson, obviously no one on appeal challenged the finding or the district court's conclusion that the evidence could be used to show discriminatory intent in that case. So you would look at the particular office's pattern of stops, the racial disparity, or I guess if there is a racial disparity in that pattern of stops. Another factor that a court could consider is if the basis for the traffic violation is something that no other officer would have stopped the car for, that could also be probative of discriminatory intent. But that'll be hard enrichment, right? Because I think at least part of the evidence that you say is not connected to this stop is that they do do pretextual random stops. They stop people for very small reasons. They do, but- If I could just, the raw statistical, or I'm sorry, the raw data that was available under the Community Policing Act here actually did provide the code section for each stop, or they were required to submit the code section. Obviously there were some missing entries in this data. And so I do submit that if there was the code section cited, no other driver, or I'm sorry, no other officer had relied on to pull over a driver, that would be probative, that an officer was really kind of going beyond the norm. I think that goes to, it sort of folds into the probable cause analysis, right? When there's really, really weak evidence of probable cause and a stronger showing of animus, that would tend to support the inference that the basis for the stop was something impermissible. But here, because we have such strong probable cause and no evidence of animus, right? That's the district court's express finding. That's why we maintained that the court's conclusion that these officers had any discriminatory purpose in making this stop is simply not supported by the record. In terms of your statistical evidence, I think your argument is that in order for the statistical evidence to matter, there would need to be a showing of what percentage of drivers on the all the time were white versus which percentage were black. But it wasn't enough just to show that drivers five to one or more than five to one were pulled over, the black drivers were pulled over. How would one prove then, what statistical evidence would be satisfactory in your view? What if there were 100 to one? Would that be enough? Respectfully, your honor, it would not be enough under Armstrong and this court's decisions in Olvis and Venable, which the evidence in those cases all involved even starker, raw statistical disparities, right? So in Armstrong and actually in this court's decision in Hare as well, both of those disparities were 100%, right? All of the defendants in the respective categories were black. Similarly in Olvis, it was over 90% of the defendants charged in crack cases in the Norfolk and Newport news divisions of the Eastern District of Virginia were black. And similarly in Venable, 86.7% of the defendants charged with 922G offenses in the Richmond division of the Eastern District of Virginia were black. So the bare fact of a statistical disparity, no matter kind of like the numerical value, that does not satisfy the defendant's burden under all precedent that I'm aware of. Because there are two prongs, would it satisfy one of the two prongs? So we're talking about discriminatory purpose. I think in order to make a showing of discriminatory effect, it's clear again from Armstrong in this court's cases that there has to be still some showing of a similarly situated comparator. And I think maybe it would be helpful to separate out what exactly the data is that we're talking about in this case. We maintain that the most probative statistical evidence about the officer's decision to stop Mr. Moore's car here is the data about the initial stops. And there we know, because Dr. Costin testified that there was no comparator, period. So we're not even talking about whether it was a sufficient similarly situated comparator in the initial stop data. There's just no comparator. Wait, I'm sorry, what do you mean when you say no comparator? There was no comparison to anything. It was just a raw statistical disparity. And I distinguish that from, for example, the heat maps, where the comparator, I guess, is the underlying 2015 to 2019 census supplement as a comparison to the rate of stops of black drivers. What got me confused is I thought the district court almost suggested, and maybe I misread this, that comparator data would require like coming up with the names of people. That's not the government's position. It's not, Your Honor. And we acknowledged in the district court that that's not the requirement that aggregate statistics could be used to make this showing. The district court simply erred in, I guess, its conception of what is required to make this selective enforcement claim. A couple of other problems with the statistical data. Again, the defendant's own expert conceded that this could not show causation repeatedly throughout the evidentiary hearing. And causation is a critical component of proving discriminatory purpose on the part of these officers. And again, this data reflects citywide traffic stops. It's not specific to these officers. It's not specific to the fourth precinct. So it's pretty far removed and difficult to make any inference about what these officers intended just based on this general traffic stop data. Can I ask you one other question about the district court opinion and purpose? I read, well, I guess I should ask you, do you believe the district court in thinking about purpose was asking the question you're putting in front of us now? Did these four officers have a discriminatory purpose? Or was the district court asking something more general? Is the stopping process, the general way Richmond police conduct traffic stops, does that have a discriminatory purpose? Judge Harris, as I think our discussion might illuminate, it's sort of difficult to discern what another person is actually thinking in the moment. So I'm not sure what the district court was- I'm not going to read between the lines. I'm just reading the lines. I'm reading the opinion and it never does say anywhere these four officers have a discriminatory purpose. No. No. I mean, the district court made the express finding that these four officers did not- Actually, if I recall, the court said something that we've got to stop this problem, sort of suggesting that the court was drawing on a personal experience or history in Richmond over a period of time, which of course doesn't implicate the four officers in this case. But it does tend to suggest that maybe the court was looking beyond the horizon on that. Well, I think that the district court, I mean, I'm reading from the opinion, really was relying heavily on the data that was presented and in showing, in his words, a disgraceful disparity in enforcement of traffic laws, black drivers getting the short end of the stick, and then going so far as to say that this policy or this practice prevents black people- So now I understand that we're talking more about historical background kind of evidence. I think if there were something, first of all, more recent than 1989, and second, that was specific to the Richmond Police Department, some evidence that perhaps they were using potential traffic stops to target black drivers, I mean, that would be really critical evidence of what the officers were doing in this case. But here, we just don't have anything that's connected to these officers or to the Richmond Police Department. It's so that both the Supreme Court and this court consistently rejected it as insufficient to infer a discriminatory purpose. Is that it? Unless the court has further questions for me at this time, I can reserve the remainder of your time. Good morning, Your Honor, as I may face the court. Rahini Kashma from Mr. Moore who is with us today in the audience. I'd like to briefly note that we believe that this report correctly applies by the common standard, and that decision has been foreclosed, but to the extent this court believes otherwise, the correct approach would be to vacate and remand because this is a factually intensive question, and Judge Kennedy was very much on on the standard. I'd like to start there. So the evidence Mr. Moore proffered itself was in part by discriminatory purpose. So when coming to that conclusion, Judge Kennedy was looking at RPD as implemented by these four officers, and as this court has recognized in Hare, where Hare was looking at the motivations of the ATF entity rather than the specific undercover agents involved, the discriminatory purpose analysis isn't necessarily confined to specific people, and here it was RPD as implemented by these four officers. Would you agree that in order to throw out the indictment in this case, the defendant would have to demonstrate that his indictment was the product of improper racial motive? Yes, your honor. So under, and we're faced in this record with statements by both the expert and the district judge that the data do not support that with respect to this particular incident. I would disagree with that. So the district court was looking at the statistical, the expert said that he could not conclude that this particular incident was motivated by race, and so did the district courts make that statement. It is, so the statistics, when looking at the discriminatory purpose analysis, it's the totality of the facts. So it's not just the statistics in isolation, but it's also the pattern and conduct of these focus mission team officers that night, and all of that together permits that inference. So when we're talking about Dr. Koston's analysis, Dr. Koston was looking at the spread out of Richmond's racial demographics through census data, which is a method that the district court found was reliable, and this was an evidentiary dispute about the use of census data as a benchmark for who's on the road, and the quintessential battle of the experts that the district court found at JA1802 that Dr. Koston's methodology was reliable, and that's a finding the government has affirmatively waived an appeal on it for the opening brief. Now those heat maps showed- No, I'm not sure there's been an agreement on that. I'm not sure we have to get into it, but Dr. Koston basically compared the number of stops of African Americans against the population of Richmond, and the government points out that the comparison should really be a comparison of the drivers in Richmond. Otherwise, you're taking into account children who don't drive, and you take into account all kinds of other people, including other minorities, because the data also excluded Asians and Indians and these other minority groups. So I'm not sure we have to conduct a probe into whether Dr. Koston's analysis was correct, but the government has pointed out it's very suspect. No, Your Honor. I think maybe it would help to take a step back and look at Dr. Koston's analysis. Dr. Koston's analysis fell into three buckets. So when we're talking about the use of census data as a benchmark, that was with respect to the heat maps, and whether that was reliable was something that was fully aired before the district court, and the district court found to be reliable. And what that map showed was if we look at figure five of Dr. Koston's report on JA363, that map shows that in the fourth precinct, that precinct, which is not uniformly predominantly Black, the western side is predominantly Black, but the eastern side, which borders the predominantly White third precinct, is predominantly White. But when looking at the clusters of drivers stopped throughout that precinct, and as figure two on JA361 shows, the only clusters of drivers being stopped in the predominantly White portions of the fourth precinct were Black drivers. There are zero clusters of White drivers being stopped throughout, and that was evidence that fed to this Council, can I ask you a question, or maybe just give you a chance to respond? I mean, I found a lot of the evidence in this case very compelling. And I take your point. It just seems to me that there's like a little bit of a mismatch between the evidence and then the particular remedy that is being sought, which is dismissal of an indictment. And as I think you agree, if we're talking about dismissal of an indictment, you have the defendant or the plaintiff here has to show, like, and that is why this happened to me. Like, if this were a class action suit, or, you know, someone, I can think of other contexts, other kinds of litigation contexts in which this evidence would be extremely compelling. But I do think you have a problem with connecting this very compelling case about what is going on, big picture, with what happened to this guy this night? And it's a compound question, but there's only one other part. I am struck every time I look at this case by the fact that this doesn't actually look like a pretextual traffic stop. He didn't get pulled over for something hanging from his rear view mirror for having tinted windows. He got pulled over because the police saw the same fake license plate number being used three times in a row. And it does seem like, you know, that is probably an unusual enough occurrence that probably any reasonable officer would have made this stop. So I just want to give you a chance to respond to my concern. So to start with the first part of that question. So it's not the statistics alone. It's also what these four officers were doing that night. So specifically one pursuing black drivers in a predominantly black neighborhood of the not uniformly black fourth precinct to pulling over only black drivers, they pulled over five people that night, all of them were black. And three, they're disproportionate responses to these traffic infractions they were enforcing. So for well, they were they were assigned to the fourth precinct that night, right? Yes, your honor. But the fourth precinct is, is a, I guess, predominantly black area of Richmond, isn't it? Not uniformly, though, your honor, there's a uniformly predominantly in the western side, but the eastern side is predominantly white. And these officers went to the predominantly black section. And so with respect to the disproportionate responses to traffic lights, we can see in the body camera footage in this case that, for instance, the first driver who was the dad going Christmas shopping, he forgot to turn on his headlights. And to enforce that minor traffic infraction, all four officers surrounded the car, shone flashlights inside to investigate. But the meaningful fact is that the officer stopped that car. The officer stopped the second one they saw and let them go. And the officers tried to stop the third one. But the third one ran. And then we had a chase, right? Yes, your honor. But what we're looking at my point is that all three of them were stopped because they this license, this cardboard license number was the same identical license number what 11134Y printed on cardboard. And they were all using it. And they didn't find that to be such a heavy violation that the first two they stopped, they gave him a chance to pull over and drive it and correct it. But the third one, the reaction of the person stopped, prompted the escalation, because he didn't stop. He ran into curb and then ran left door open of his car. And, and, and a gun sit lying there on the floor of the car in plain view. I mean, I don't see how the fact that the officer stopped the first two supports anything. So I think to clarify, when we're looking at the discriminatory purpose analysis, it's at the time the officers chose to make the stop. So what happened after they turned on the lights doesn't factor into that analysis. But when we look at how the officers treated the first two cars who had this duplicate tag issue, that indicates that they didn't actually think that this tag issue was serious or something that and that may not even on the third. But the third, the scenario was when they tried to stop the car. Unlike the first two, the driver reacted by But that that falls outside of the discriminatory purpose analysis, because discriminatory purpose asked about when the officers decided to turn on the lights to initiate the stop. Where was that decision motivated in part by race? They saw the license plate. Isn't that a good reasons of a fake license plate? No, your honor. So I think this is where the distinction between probable cause and fourth amendment claims versus equal protection comes in. We're looking at purpose, you're trying to find evidence of purpose. And you were pointing to fact that they stopped two others who were black with the same license plate. And I'm saying that cuts just the opposite. Because they stopped those two, they didn't think it was that serious a charge. Neither one of the first two got charged. They were given their explanation, and the officers accepted it. And so they go to chart, stop the third one in the same manner. And the point being, it wasn't a serious charge. It's a license plate, but it's a legitimate concern. Three cars with the same license plate number card. However, the Supreme Court has been clear in Arlington Heights that the so the discriminatory purpose doesn't need to be the sole motivating their government agencies and entities are motivated by a variety of factors. And so here that there may have been probable cause does not foreclose the 14th Amendment challenge. But it doesn't it under Ren, you don't look at the officer's motive, unless race is an issue. And the question is, from the facts, this case, it doesn't look like they were motivated by race, it looks like they were motivated by the peculiarity, they almost chuckled at it, that there were three license plates with identical numbers. And so they stopped all three in sequence. There may have been more out there, somebody may have been printing those things up and letting people sell them or whatever. But so I think one of the key points in this case is that the officers involved in this case are not actually focused on traffic enforcement, their sole goal, and they admitted this in open court is that they use these minor traffic infractions as a way to go target drivers who have no, they had no reason to suspect of being involved in guns and drugs. Did the district court make findings of fact on any of these factual statements that you're putting forward here? So as in the pretextual or their use of... On purpose, did the district court make, find that there was discriminatory purpose? And what do we do with that fact if the district court did not? So the district court did find that the evidence proffered met the standard for discriminatory purpose. And when looking at totality, that included what was happening on the night. And as the district court... The same question I asked your colleague, I couldn't find a place where the district court said this stop, these four officers were motivated at least in part by a discriminatory purpose when they made the stop. I saw the district court saying things like Richmond's stop process or program has a discriminatory purpose, but I couldn't... And I'm asking, if I missed something, please tell me, but do you understand the district court to have held that these four officers, this stop motivated in part by race? I believe so because the district court was looking at RPD as implemented by these officers that night. Right, but RPD is not these four officers. Correct, Your Honor, but the district court was presented with significant amounts of evidence of what was happening that night. And how do you explain the part where the district court said, as it seemed to be a finding of fact, no bad faith or invidious motive here? But that's not this false tip because as this court has seen in Hare, the discriminatory purpose analysis can look at the underlying motivations of the entity. So here it was... They're saying it didn't have to show that these four officers had discriminatory purpose. It was specifically that RPD has a consistent pattern of disparate treatment and these four officers' actions that night confirm that suspicious pattern. And as we've seen through the video camera footage, it indicates that there's evidence of racial... No, this is not a 1983 case or some kind of challenging a practice case. This was a criminal indictment and the indictment was thrown out. And so the question was, was the indictment the product of a discriminatory purpose? And that link is pretty important, isn't it? It is important. That's the only thing we have to answer. Was this indictment properly thrown out because it was motivated by an improper discriminatory purpose? And the answer to that is, as the district court concluded, yes, because when we look at both the statistical evidence in combination with the events of that night, it shows that the focus mission team officers here were deliberately pursuing black drivers to stop them for criminally investigative stops. And the statistics show that white drivers in Richmond are neither subjected to these stops, these criminal investigative nature stops, and they also are not stopped anywhere near as frequently as white drivers. So the government was alluding to sheer disparities, but the selective prosecution cases they were relying on, in those cases like Armstrong, the Supreme Court explained that different races were committing those crimes at different rates. But here, Dr. Costin testified, both in the report and at the hearing, that there's absolutely no evidence to suggest that black drivers commit more traffic infractions than white drivers. And the district court found that, Dr. Costin, to be both reliable and credible. And so the disparity here can't be explained purely by black drivers just running more red lights or anything like that. The way I read the district court opinion, and maybe this is what you're saying, is like, look, we have these citywide statistics, we have the history, and just as a matter of common sense, we ought to be asking, well, what takes these officers out of that pattern? Almost like a burden shifting thing. Again, I don't see anything showing that these four officers weren't consistent with the history, consistent with the statistical patterns. Is that sufficient? Oh, that they were consistent? Yeah, would that be enough to show purpose? Look, we know what's going on, big picture, and why would we think these officers and everything about this stop lines up with that big picture so we can kind of assume they probably had a discriminatory motive? I believe so, but we also have more than that here. We have the evidence of these officers going into a predominantly black neighborhood using minor infractions, like forgetting to turn on headlights. Well, that's sort of what I mean. We have all this general evidence, not about this stop. And when you put it all together, why wouldn't this stop be consistent with all that general evidence? Yes, Your Honor. And here we also have that these officers, they clearly were not interested in the duplicate tag issue, but because they saw Mr. Moore, they saw that he was black, they knew that this was an excuse they could use to criminally investigate. How do we know that? They were on patrol, and they saw these license plates. That's the evidence. They were on patrol in the 4th Precinct, and they saw these three license plates, and they made stops on all three. They obviously didn't think it was that serious a violation. Which is precisely why the select enforcement argument is Mr. Moore was black. The fact that they made the stops in the other cases and did not charge the people suggests that they weren't out using motive to stop them just because they were, I guess they were blacks driving with those false license plates. But, well, I understand your position though. It's because they were using these infractions that they don't care about to criminally black people. Just to clarify that, affirming here does not mean that all black drivers in Richmond will have their indictments dismissed, which is, I think, one of the government's parade of horribles. So, even sure the statistical evidence might be more generally applicable, but that was specific. No, but I tell you what could happen is the very same, another stop is made in Richmond, the driver is black, and he puts on these very same two reports and nothing else. And he's home free. No, your honor, because, so in part because the, well, if these two, if these two expert opinions are sufficient to support throwing out this indictment, why wouldn't they be sufficient to throw out another indictment? It is the expert opinions plus the events that happened that night. But with respect to the statistical evidence's applicability, that was confined to 2020. And as the district court recognized in its reconsideration opinion, there is significant evidence that in the years past, this disparity that we see in the 2020 analysis has not, has dissipated over the years. So, someone trying to raise this claim now would not be able to rely on the evidence presented here. But on top of this expert reports and evidence here, we do have both body camera footage and evidence of what these four focus mission team officers were doing that night, which is going to a predominantly black neighborhood, targeting black drivers and subjecting them to criminal investigative stops. And all of that is also backed up with the statistical analysis, which shows the inverse is not true for white drivers from Richmond. White drivers are not pulled over. They are certainly not subjected to these type of criminally investigative stops. And all of that together as that totality of the facts permits the inference of discriminatory purpose be drawn in this case, which is why the district court did not err in dismissing Mr. Moore's indictment. If there are no further questions, we would ask that you affirm. All right. Thank you, Mrs. Judge. Just a couple points in rebuttal, your honors. I'll start with the most recent point my friend made. She suggests that there's some kind of limiting principle to the district court's decision because the district court actually combined reliance on these expert reports with the facts of what happened on the night of December 5th, 2020. That's not correct. If you look at the district court's opinion, the district court made no findings about the focus mission team, about a pattern of stops that those officers were conducting. There's nothing specific to these officers. And again, that is fatal to this claim. Another point I wanted to follow up on, Judge Harris, you had asked basically, could we impute the practices generally of the Richmond Police Department to these four officers? We know from the Supreme Court's decision in weight and countless cases in this court like Venable, no, it has to be a showing that the decision maker in this defendant's case acted with a discriminatory purpose. So general information about the Richmond Police Department historically, or perhaps more generally in 2020, is not probative of these four officers' intent in conducting this traffic stop. And if we agree with you on that issue of discriminatory purpose, do we even need to reach the issue of discriminatory effect? No, you don't. You can reverse solely on discriminatory purpose as the Supreme Court did in Basswell on the failure to show discriminatory effect in that case. Okay. Unless the court has further questions, we ask that you reverse and remand with instructions to reinstate the indictment. Thank you. Thank you. Ms. Tashma, were you court appointed? No, sir, but I was brought on as pro bono counsel. Well, thank you. Anyway, I normally like to acknowledge and credit people who are appointed by the court to serve the court. But the pro bono work is also important. We recognize that. Thank you. We'll come down and greet counsel. And we'll proceed on to the next case.
judges: Paul V. Niemeyer, Pamela A. Harris, Nicole G. Berner